**SCFC ILC INC. d/b/a MountainWest Financial, Plaintiff,**

v.

**VISA U.S.A. INC., Defendant.**

**No. 91–C–0047–S.**

United States District Court, D. Utah, C.D.

Feb. 22, 1991.

Gary F. Bendinger, Richard W. Giauque, Giauque, Wilcox & Bendinger, Salt Lake City, Utah, Randall A. Hack, Leonard A. Gail, James D. Sonda, James H. Gale, William H. Pratt, Kirkland & Ellis, Chicago, Ill., for plaintiff.

Dale A. Kimball, Jonathan A. Dibble, Elaine A. Monson, Don B. Allen, Ray, Quinney & Nebeker, Salt Lake City, Utah, for defendant.

## MEMORANDUM DECISION AND ORDER

SAM, District Judge.

This matter is before the court on the motion of plaintiff SCFC ILC Inc. d/b/a MountainWest Financial (MountainWest)[1] for a preliminary injunction to prevent Visa U.S.A. Inc. (Visa) from prohibiting MountainWest from participating in its Visa program. The hearing on this motion took place on February 7, 1991. William H. Pratt, Esq. argued on behalf of MountainWest and M. Laurence Popofsky, Esq. represented Visa.[2]

*Background*

The facts relevant to this motion are as follows:

In June 1989, Visa enacted the following amendment to its by-laws prohibiting

---

1. SCFC ILC Inc. is owned by Sears Consumer Financial Corporation, a subsidiary of Sears. The predecessor of MountainWest Financial operated as MountainWest Savings and Loan Association.

2. Stephen V. Bomse, Esq., also counsel for Visa, cross-examined MountainWest's witness Philip Purcell immediately prior to oral argument on the motion.

Sears, which issues the Discover card, from becoming a Visa member:

> RESOLVED, that Section 2.06 of the By-Laws be and are hereby amended by adding the following sentence at the end of that Section as follows:
>
>> "Notwithstanding (a) above, if permitted by applicable law, the corporation shall not accept for membership any applicant which is issuing, directly or indirectly, Discover cards or American Express cards, or any other cards deemed competitive by the Board of Directors; an applicant shall be deemed to be issuing such cards if its parent, subsidiary or affiliate issues such cards."

The above by-law was apparently enacted in response to Sears' effort to participate in the Visa program through Greenwood Trust. Sears did not challenge the by-law at that time nor did it further attempt to participate in the Visa program through Greenwood Trust.[3]

On May 25, 1990, SCFC ILC Inc., a subsidiary of Sears, purchased MountainWest Savings and Loan, operating in the State of Utah. MountainWest Savings and Loan had been placed into federal receivership. Control of such failed institutions is assumed by the Resolution Trust Corporation (RTC). Among the powers of RTC is the authority to transfer assets of institutions to private sector owners at the best possible prices. Included among the assets SCFC ILC purchased from RTC were "all agreements, forms, procedures and memberships ... including, but not limited to, the VISA U.S.A. Inc. membership of the Failed Association." Visa claims that at the time of purchase it did not know that SCFC ILC was a Sears subsidiary. However, articles appeared in national publications concerning Sears' transaction with RTC and the transaction is also a matter of public record.

Pursuant to Visa By-Law § 2.08, Visa requested SCFC ILC to reapply for membership in the Visa program. That by-law provides that the membership of a participating institution terminates at the time of transfer and that the purchaser of the transferred institution, if it desires Visa membership, is obligated to reapply. SCFC ILC filled out the necessary forms, but on the top of those forms printed "Updating existing membership information", thereby indicating to Visa that SCFC ILC did not consider it necessary to reapply for membership because membership was an asset purchased in the sale by RTC.[4] Visa did not respond to, or in any way challenge, the notations made by SCFC ILC on the top of each page of the forms.[5]

After the purchase of MountainWest Savings and Loan, Sears decided to launch the "Prime Option" program through which it would offer Visa cards to consumers at very competitive terms. In preparation for that program, MountainWest ordered 1.5 million cards bearing the Visa and "Prime Option" logos.

On January 8, 1991, Visa received notification that SCFC ILC had placed an order for 1.5 million cards bearing the Visa logo. Up to that time, MountainWest had only issued approximately 5,800 Visa cards to its account holders. This request triggered

---

**3.** More recently, Visa has taken two other steps aimed at non-bank corporations designed to limit or prevent their participation in the Visa program. On October 10, 1990, the Visa Board revised Visa's operating regulations to restrict "affinity" programs such as the one used by AT & T in conjunction with a small Georgia bank. The AT & T Visa card has already attracted nearly eight million consumers and is being challenged by certain large Visa members. On November 30, 1990, the Visa Board announced a six-month moratorium on memberships for any bank whose parent is a non-bank.

**4.** Congress, through the Financial Institutions Reform, Recovery and Enforcement Act of 1989

(FIRREA), gave RTC broad powers to transfer the assets of failed institutions, including the right to transfer any asset "without any approval, assignment, or consent with respect to such transfer." 12 U.S.C. § 1821(d)(2)(G)(i)(II).

**5.** Visa By-Law § 2.10 provides the procedure whereby Visa may terminate the membership of any of its existing members. According to that by-law, Visa must call a vote of its Board of Directors and receive approval for termination by a two-thirds vote. Visa has not attempted to terminate MountainWest's alleged membership by that procedure.

some investigation by Visa which revealed that SCFC ILC was a Sears subsidiary. Upon such discovery, Visa prohibited MountainWest from obtaining the Visa cards, thereby effectively preventing MountainWest from launching the "Prime Option" program. MountainWest thereupon filed this lawsuit which raises claims of federal and state antitrust violations and unfair trade practices. Jurisdiction is predicated on 15 U.S.C. §§ 15, 26 and 28 U.S.C. §§ 1331, 1337. Included in the prayer for relief is a request for a permanent injunction. Shortly after filing this lawsuit, MountainWest moved for a preliminary injunction which is the subject of this memorandum decision.

After the hearing on that motion and further review of the pleadings, the court requested additional briefing on the issue of whether the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) provision permitting RTC to transfer assets without approval violated the Contract Clause of the United States Constitution. The briefs were submitted on February 19, 1991, after which MountainWest's counsel was given until 10:00 a.m. the following day to respond to new arguments raised in Visa's post-hearing brief.[6]

A preliminary injunction is designed to preserve the status quo during the course of litigation. *Litton Systems, Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir.1984). The parties to this lawsuit have divergent opinions as to what constitutes the status quo. The court will focus initially on the status quo issue, the heart of this dispute.

*Status Quo*

■ According to Visa, MountainWest is not authorized to participate in the Visa program because, pursuant to Visa By-Law § 2.08, the membership of MountainWest Savings and Loan terminated when its assets were transferred to SCFC ILC. Therefore, Visa contends that this motion should be treated under the more stringent standard applicable to motions for mandatory injunctions in which a party requests a departure from the status quo.

On the other hand, MountainWest claims that Visa By-Law § 2.08 was rendered ineffectual by FIRREA legislation which authorizes RTC to transfer all assets of a failed institution "without any approval, assignment, or consent...." 12 U.S.C. § 1821(d)(2)(G)(i)(II). MountainWest claims that its Visa membership remains intact and that preservation of the status quo would permit it to launch the "Prime Option" program just as any other Visa member would be permitted to do.

■ At oral argument, Visa's response to the FIRREA provision was an unsupported allegation that such legislation is an unconstitutional violation of the Contract Clause.[7] In the post-hearing brief submitted to the court, Visa fails to provide any support for that proposition, but concedes that "FIRREA *would* invalidate a contract clause that made the act of transfer, itself, a ground of termination or default...." Visa's Post-hearing Memorandum at 3 (emphasis added). However, Visa contends that FIRREA cannot authorize an otherwise ineligible institution to participate in the Visa program.

Visa cites *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27 (1st Cir.1984), in which the First Circuit reversed the bankruptcy and district courts' approval of the assign-

---

**6.** Despite the court's request that the post-hearing briefs be limited to the issue of FIRREA and the Contract Clause, Visa's brief fails to address that issue. Instead it provides the court with new arguments as to why MountainWest should not be considered a Visa member.

**7.** The Contract Clause of the United States Constitution does not prohibit the federal government from impairing contracts. It applies only to state action. Federal economic legislation is instead challenged under the Due Process Clause—a challenge which is not raised by Visa.

However, federal statutes have a "presumption of constitutionality," *National R.R. Passenger Corp. v. A., T. & S.F. Ry. Co.*, 470 U.S. 451, 472, 105 S.Ct. 1441, 1455, 84 L.Ed.2d 432 (1985), and are upheld unless Congress has legislated to achieve its purpose in an "arbitrary and irrational way." *Userv v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). FIRREA reflects a rational attempt to protect an important public interest by ensuring that a failed institution's asset values are preserved at the time of sale.

ment of a Ford dealership over Ford's objection. According to Visa, the case stands for the proposition that the bankruptcy court could not compel assignment "[n]otwithstanding the express provisions of the Bankruptcy Code invalidating anti-assignment clauses...." Visa's Post-hearing Memorandum at 4 (footnote omitted). Visa fails to acknowledge, however, that the First Circuit based its decision on the following express exception to the bankruptcy provision which invalidated anti-assignment clauses:

> (c) The trustee may not assume or assign an executory contract ... whether or not such contract ... prohibits assignment if—
>
>> (1)(A) applicable law excuses [the other party to the contract] from accepting performance from ... an assignee ... whether or not [the] contract prohibits ... assignment.

11 U.S.C. § 365(c)(1)(A). That provision required application of a Rhode Island statute which outlawed assignments of dealerships without consent.

Visa has not brought to the court's attention any exception to 12 U.S.C. § 1821(d)(2)(G)(i)(II), the FIRREA provision which allows RTC to transfer assets of a failed institution without consent. The existence of an exception to a similar bankruptcy provision demonstrates that Congress could have included such an exception had it been so inclined. The court will not create an exception to a clear expression of congressional intent where no exception exists.

The court's conclusion is further supported by another FIRREA provision which demonstrates congressional intent to give broad powers to the receiver of a failed institution. RTC is given the power to repudiate contracts entered into *before* its appointment when RTC, in its "discretion", considers performance of the contract to be "burdensome" and concludes that repudiation "will promote the orderly administration of the institution's affairs." 12 U.S.C.

§ 1821(e)(1). In view of the fact that Congress empowered RTC to repudiate contracts, the court cannot say that empowering RTC to transfer assets without consent rises to the level of a constitutional violation.

Visa also argues that MountainWest is not qualified to use the Visa trademark and that Visa is "required ... to approve all uses of its trademarks." Visa's Post-hearing Memorandum at 7. It appears, from the record, that when a Visa member orders cards, the manufacturer notifies Visa in order to obtain routine authorization. It also appears that authorization has been routinely given to all members of Visa, including MountainWest when it requested new cards changing the logo to "MountainWest Financial." Visa has not provided the court with any basis upon which Visa could withhold authorization from a *member* institution. The purported reason for withholding authorization was that MountainWest was not qualified to be a member based on Visa By-Law 2.06 which only precludes a Sears subsidiary from obtaining a new membership.

The court concludes that when SCFC ILC purchased MountainWest Savings and Loan, the Visa membership was among the assets transferred.[8] The fact that MountainWest provided information to Visa on Visa's application form does not deprive MountainWest of its membership status. MountainWest expressly indicated on the top of each page of that form that it was "Updating *existing* membership information." (Emphasis added). Because Visa never terminated that membership through the procedure outlined in Visa By-Law § 2.10, MountainWest's membership remains intact.

In its argument to the court, Visa represented that *any* of its members would be entitled to launch a large scale Visa program similar to "Prime Option". Because the court has concluded that MountainWest is a member of Visa, MountainWest is entitled to enjoy all of the rights and privileges

---

**8.** Although Visa By-Law § 2.06 provides that Visa will not accept new membership applications from Sears, it does not prohibit Sears from becoming a member by acquiring the assets of a member institution.

of membership, including the right to launch the "Prime Option" program. However, the antitrust issue before the court concerns Visa By-Law § 2.06 which may be inapplicable under the present circumstances. That by-law only purports to give Visa the right to reject membership *applications* submitted by Sears subsidiaries, but says nothing which could be interpreted to prevent such subsidiaries from maintaining a valid membership status. Accordingly, the court is concerned that there may not be standing to challenge the alleged antitrust violations. Both parties will have the opportunity to brief the standing issue for the court.

For purposes of the motion for preliminary injunction, however, the court will assume that there is standing to raise the antitrust issues alleged in the complaint and will proceed accordingly.

As stated above, the court's interpretation of the status quo is that SCFC ILC obtained the Visa membership by operation of FIRREA when it purchased the assets of MountainWest Savings and Loan. Accordingly, the court will not treat the motion for a preliminary injunction as a motion for a mandatory injunction, as urged by Visa, because MountainWest is seeking to preserve, rather than depart from, the status quo.

*Preliminary Injunction Motion*

In order for a party seeking a preliminary injunction to prevail, that party must demonstrate that: (1) it is likely to prevail on the merits; (2) without an injunction it will suffer irreparable harm; (3) the threatened harm would outweigh any damage suffered by the party enjoined; and (4) the injunction would not be adverse to public interest.

With respect to the first factor which must be met by a party seeking a preliminary injunction, the Court of Appeals for the Tenth Circuit has adopted a more relaxed standard. In *Otero Savings and Loan Association v. Federal Reserve Bank of Kansas City, Missouri*, 665 F.2d 275, 278 (10th Cir.1981), the court held:

The Tenth Circuit has adopted the Second Circuit's liberal definition of the "probability of success" requirement. When the other three requirements for a preliminary injunction are satisfied, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

In view of the Tenth Circuit position, the court will first examine the final three requirements for a preliminary injunction.

■ MountainWest claims that if the injunction is not issued it will suffer irreparable harm because it will not be able to proceed with "Prime Option" in March 1991 as planned. Money damages which cannot be readily ascertained are sufficient to satisfy this factor. *Tri–State Generation and Transmission Association, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1361–62 (10th Cir.1989). MountainWest offers evidence in the form of an affidavit that "Prime Option" is designed to fit a market niche that is currently open. Visa contends that a "six month delay" cannot cause irreparable injury. The court concludes that any delay is likely to exceed six months and that, in any event, economic uncertainty and the possibility that another Visa member would move in the intervening months or years to launch a program aimed at the same market could irreparably harm MountainWest.

The third element of a preliminary injunction requires a balancing of the damages each party is likely to suffer. MountainWest claims that the harm currently threatened by its inability to proceed with "Prime Option" outweighs any damage Visa could suffer as a result of the injunction. Visa contends that if MountainWest's proposed program is launched and Visa ultimately prevails on the merits, Visa will not be able to sell the "Prime Option" portfolio and will suffer a loss of good will. Although there is conflicting evidence before the court with respect to the ease of selling portfolios, the court is persuaded that potential harm to MountainWest outweighs this threat.

Visa also complains that it will suffer because a competing card issuer will have access to confidential information. The court declines to give any weight to this argument in light of the fact that most Visa members already issue the competing MasterCard and presumably have methods of insulating alleged trade secrets. There appears to be no reason why Sears cannot do the same.

In addition, the record before the court suggests that "Prime Option" will *benefit* Visa and its members. MountainWest suggests that "Prime Option" has the potential to attract new customers and stimulate increased usage of VISA Cards. (O'Hara Affidavit ¶ 38). Not only will increased usage of the Prime Option VISA Card generate additional revenues for Visa members who process the receivables, but Visa will receive greater dues payments from MountainWest. *Id.* MountainWest also predicted that payments to Visa, which were $3,406 for the last 9 months of 1990, will grow to $200,000 for 1991 and total $17.8 million through 1997. (Ware Affidavit ¶ 5; O'Hara Affidavit ¶ 38).

Finally, the court must consider what effect a preliminary injunction might have on the public interest. MountainWest contends that consumers will benefit from lower prices, higher quality, and better service through the competitive impact of the "Prime Option" program. Visa, on the other hand, suggests that "Prime Option" customers will experience disillusionment and unease should their credit card service be interrupted or impaired by a Visa victory on the merits. MountainWest points out that if the "Prime Option" portfolio can be readily sold, consumers would not be inconvenienced. Visa also suggests that its other members will be harmed when their Visa customers are, in essence, attracted away by potentially more favorable terms offered by "Prime Option." That alleged harm suggests that perhaps it is in the best interest of the consuming public to allow "Prime Option" to proceed.

The court notes that Congress has bestowed broad powers upon RTC to effect efficient transfers of assets of failed institutions "in a manner which *maximizes the net present value return* from the disposition of [failed] institutions," and *"minimizes the amount of any losses* realized in the resolution of cases." 12 U.S.C. § 1441a(b)(3)(C)(i), (iv) (emphasis added). The court concludes that congressional intent in enacting FIRREA in the face of the savings and loan crisis and its expedited methods in responding to that problem would be frustrated should the court adopt Visa's position. Accordingly, the court concludes that it would be in the public's interest to interpret FIRREA in the manner which would allow MountainWest to proceed with "Prime Option."

Because MountainWest has satisfied the final three elements, the court must determine whether MountainWest has demonstrated that "questions going to the merits [are] so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Otero Savings and Loan Ass'n,* 665 F.2d at 278. The court is of the opinion and finds, based on the record before it, that the antitrust allegations satisfy the Tenth Circuit's relaxed standard for likelihood of success on the merits.

Accordingly, the motion for preliminary injunction is granted.

The parties are instructed to provide contemporaneous briefing to the court on the standing issue within 10 working days of the date of this order.

## PRELIMINARY INJUNCTION

The court concludes that MountainWest is a member of the Visa organization. So long as MountainWest remains a member, Visa is hereby enjoined from interfering with MountainWest's exercise and enjoyment of the rights and privileges of membership according to Visa By-Laws and industry customs and practices. This injunction will remain in effect so long as the case remains before the court.