**SCFC ILC, INC., d/b/a Mountainwest Financial, Plaintiff,**

v.

**VISA U.S.A. INC., Defendant.**

**VISA U.S.A. INC. and Visa International Service Association, Delaware corporations, Counterclaimants,**

v.

**SEARS, ROEBUCK AND CO., a New York corporation; Sears Consumer Financial Corporation; and SCFC ILC, Inc., d/b/a Mountainwest Financial, Counterdefendants.**

**No. 91–C–47B.**

United States District Court,
D. Utah,
Central Division.

Feb. 18, 1992.

---

Gary F. Bendinger, Salt Lake City, Utah, Jeffrey Cashdan, William H. Pratt, James D. Sonda, Chicago, Ill., for plaintiff.

Dale A. Kimball, Clark Waddoups, Salt Lake City, Utah, Steve Bomse, M. Laurance Popofsky, San Francisco, Cal., Don Allen, Salt Lake City, Utah, for defendant.

## MEMORANDUM DECISION AND ORDER

BENSON, District Judge.

This case came on regularly for hearing before the court on Tuesday, February 11, 1992. Pending motions at issue are plaintiff's ("MountainWest Financial") Motion for an Order Enforcing its Rights Under Federal Banking Law, and defendant's Motion to Dismiss counts VI and VII of the Amended Complaint.

After having considered the memoranda and submissions of the parties and oral argument, the court enters this Memorandum Decision and Order.

### BACKGROUND

On May 25, 1990, Sears, Roebuck & Company, through its wholly owned subsidiary Sears Consumer Financial Corporation ("SCFC"), acquired from the Resolution Trust Corporation ("RTC") MountainWest Savings & Loan ("MountainWest Savings"), a small Utah savings and loan association. SCFC merged the assets of MountainWest Savings into those of Basin Loans, a Utah Industrial Loan Company,

and renamed the new entity SCFC ILC, Inc., doing business in Sandy, Utah as "MountainWest Financial."

One of the assets of MountainWest Savings that Sears acquired from the RTC was MountainWest Savings' membership in Visa U.S.A., Inc. ("Visa"). Visa is a joint venture corporation that has credit card membership agreements with approximately 19,000 financial institutions in the United States. Visa members issue credit cards to their account holders under the name of Visa. MountainWest Savings became a Visa member in 1982 and issued approximately 5,800 Visa credit cards to its account holders. Sears attempted to use MountainWest Financial's Visa membership to launch a special low-interest plan developed by Sears called "Prime Option." Under the Prime Option program, Sears intended to issue millions of Prime Option Visa cards nationwide, and requested an initial printing of 1.5 million Visa cards. Upon learning of Sears' involvement with MountainWest Financial, Visa refused to grant permission for the initial printing of the Prime Option Visa card. Visa's refusal was based solely on the fact that Sears is the owner of MountainWest Financial. Sears issues the Discover credit card, a major competitor of Visa.

This was not the first time Visa refused to allow a company affiliated with Sears to become a member of Visa. In mid–1989, Sears had applied for a Visa membership through Greenwood Trust, a Delaware bank owned by Sears. Visa rejected the application and as a result passed Visa Bylaw 2.06, which reads as follows:

> If permitted by applicable law, the corporation shall not accept for membership any applicant which is issuing, directly or indirectly, Discover cards or American Express cards, or any other cards deemed competitive by the Board of Directors; an applicant shall be deemed to be issuing such cards if its parent, subsidiary or affiliate issues such cards.

After enactment of Bylaw 2.06, the head of Sears Financial personally visited several Visa directors to dispute Visa's decision to pass Bylaw 2.06, and to threaten legal action if Visa failed to change the bylaw. No legal action was taken at that time.

When Visa refused to approve MountainWest Financial's request for the issuance of its Prime Option program, MountainWest Financial sought a preliminary injunction against Visa pursuant to a five-count Complaint filed in this federal district court raising claims under federal and state antitrust laws and under the Utah Unfair Practices Act. The district court granted MountainWest Financial's preliminary injunction which prohibited Visa from interfering with MountainWest's Prime Option Visa credit card program. 763 F.Supp. 1094 (D.Utah 1991) (opinion by Judge Sam). Visa appealed the preliminary injunction imposed by the district court, and the Tenth Circuit Court of Appeals reversed and remanded on the basis that the district court erroneously determined that the preliminary injunction would not alter the status quo, and that MountainWest Financial did not meet its heavy burden in order to be entitled to a preliminary injunction under such circumstances. 936 F.2d 1096 (10th Cir.1991).

Upon remand, the parties resumed discovery in preparation for a determination on the merits of the antitrust claims raised in MountainWest Financial's Complaint and in a Counterclaim filed by Visa. Another twist was added to this litigation, however, when on November 27, 1991, Congress passed a statute that was signed into law by President Bush on December 19, 1991, involving obligations of service providers to RTC transferees. The statute amends the Federal Home Loan Bank Act, 12 U.S.C. § 1441a, by adding a new subsection, (q), as follows:

> *Continuation of Obligation to Provide Services.* No person obligated to provide services to an insured depository institution at the time the Resolution Trust Corporation is appointed conservator or receiver for the institution shall fail to provide those services to any person to whom the right to receive those services was transferred by the Resolution Trust Corporation after August 9, 1989, unless the refusal is based on the transferee's failure to comply with any material term

or condition of the original obligation. This subsection does not limit any authority of the Resolution Trust Corporation as conservator or receiver under section 11(e) of the Federal Deposit Insurance Act.

Federal Deposit Insurance Corporation Improvement Act of 1991 § 471, Public Law 102–242, 105 Stat. 2385 (hereinafter "Section 471").

MountainWest Financial's Amended Complaint adds two new causes of action based on this statute. Count VI, titled "Violation of the Home Owners' Loan Act," alleges that Visa's refusal to issue the credit cards sought by MountainWest Financial is a violation of Section 471. MountainWest Financial's pending Motion "for an Order Enforcing its Rights Under Federal Banking Law" is based on Count VI. The relief sought is a permanent injunction that would require Visa to issue the Visa credit cards that MountainWest Financial seeks for its Prime Option program. The relief sought by MountainWest Financial in connection with this motion is the same which it asks for in its prayer for relief in the Amended Complaint. Therefore, the motion could have been styled as a Motion for Partial Summary Judgment, and the court will accordingly analyze the motion under the terms of Rule 56 of the Federal Rules of Civil Procedure.

Count VII of the Amended Complaint is a claim for "Breach of Contract." This claim alleges that when Sears purchased MountainWest Savings & Loan from the RTC, it acquired a valid and binding Visa membership. MountainWest Financial further alleges that this contract remains valid and binding as between Visa and MountainWest Financial due to the recently enacted Section 471, and that Visa has breached the contract by failing to issue the Visa cards necessary for MountainWest Financial to issue its Prime Option program.

Visa's Motion to Dismiss alleges that Counts VI and VII of the Amended Complaint fail to state claims upon which relief can be granted. Visa's motion is based on two arguments: first, that Congress did not create a private right of action in favor of RTC transferees when it passed Section 471; and second, that Visa's refusal to continue to provide services to MountainWest Financial is within the exception to Section 471 because MountainWest Financial, by its affiliation with Sears, has failed to comply with a "material term or condition of the original obligation." Inasmuch as matters outside the pleadings have been presented and considered by the court in connection with Visa's Motion to Dismiss, this motion shall also be treated as one for partial summary judgment and disposed of as provided by Rule 56 of the Federal Rules of Civil Procedure. Fed.R.Civ.Pro. 12(b).

## DISCUSSION

### I. PRIVATE CAUSE OF ACTION UNDER SECTION 471

The first issue presented in connection with the pending motions is whether a private federal cause of action can be brought by MountainWest Financial under Section 471. Visa argues that no express or implied private cause of action exists under Section 471 for an alleged violation of the statute. Because Section 471 does not contain any remedy or enforcement provision, the question is whether a private cause of action was implied by Congress.

In determining whether a private cause of action is implicit in a federal statute, the Supreme Court has explained that the ultimate question is whether Congress intended to create a private right of action when enacting the statute. *Virginia Bankshares, Inc. v. Sandberg,* —— U.S. ——, 111 S.Ct. 2749, 2763–64, 115 L.Ed.2d 929 (1991); *Karahalios v. National Fed'n of Fed. Employees,* 489 U.S. 527, 109 S.Ct. 1282, 1286, 103 L.Ed.2d 539 (1989); *Thompson v. Thompson,* 484 U.S. 174, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988); *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 536, 104 S.Ct. 831, 838, 78 L.Ed.2d 645 (1984); *Middlesex County Sewage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981); *Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981); *California v.*

*Sierra Club*, 451 U.S. 287, 293, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981); *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 91, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979).

■ Various factors have been considered by the Supreme Court in discerning whether Congress intended a private remedy in a statute that does not expressly provide one.[1] Key factors include the language of the statute itself, the surrounding statutory scheme, and the legislative history and purpose of the statute. *Karahalios*, 109 S.Ct. at 1286; *Thompson*, 108 S.Ct. at 516; *Northwest Airlines*, 451 U.S. at 91, 101 S.Ct. at 1580; *Touche Ross & Co.*, 442 U.S. at 575–76, 99 S.Ct. at 2488–89. An analysis of these factors leads to the conclusion that Congress did not intend a private right of action under Section 471.

### A. *Language of Section 471*

The first factor to consider in determining Congressional intent is the language of the statute itself. *Transamerica*, 444 U.S. at 15–16, 100 S.Ct. at 245–46; *Touche Ross & Co.*, 442 U.S. at 568, 99 S.Ct. at 2485.

The express language of Section 471, quoted earlier, prohibits those who were obligated to provide services to an RTC predecessor institution from failing to continue to provide those services to the RTC transferee institution, unless the transferee fails to comply "with any material term or condition of the original obligation." Thus, Section 471 creates a binding contractual relationship between the service provider and the RTC transferee. The terms of this contract, which has come into being by operation of law, are the same that existed between the service provider and the failed financial institution. Because the language of the statute creates contractual rights and relationships, the implicit remedy for a violation of the statute is an action for breach of contract, and not necessarily an independent private federal action based on the statute itself.

The conduct prohibited by Section 471—failing to continue to provide services to RTC transferees—directly benefits RTC transferees. Similarly, a violation of Section 471 would directly injure an RTC transferee. Thus, an RTC transferee appears from the language of the statute itself to be "one of the class for whose *especial* benefit the statute was enacted." *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). However, "the fact that an enactment is designed to benefit a particular class does not end the inquiry; instead, it must also be asked whether the language of the statute indicates that Congress intended that it be enforced through private litigation." *Universities Research Ass'n v. Coutu*, 450 U.S. 754, 771, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981); *see also Touche Ross &*

---

1. Four factors were set forth in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (citations omitted):

First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,'—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

Later Supreme Court opinions indicate that the four factors set forth in *Cort* are "guides to discerning [Congressional] intent." *Thompson v. Thompson*, 484 U.S. 174, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988). *See also Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979) ("the first three factors discussed in Cort—the language and focus of the statute, its legislative history, and its purpose—are ones traditionally relied upon in determining legislative intent"); *Miller v. United States*, 710 F.2d 656, 667 (10th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 316 (1983) ("Subsequent formulation and refinement of the *Cort* criteria have indicated that a Congressional intent to create or deny the private remedy asserted is the weightiest factor.").

*Co.*, 442 U.S. at 576, 99 S.Ct. at 2489 ("Certainly, the mere fact that § 17(a) was designed to provide protection for brokers' customers does not require the implication of a private damages action in their behalf."). The language of the statute does not appear to create any remedy for the RTC transferee beyond an action for breach of contract, which is made possible by the obligation created by Section 471.[2]

### B. *Surrounding Statutory Scheme*

Having considered the language of Section 471 itself, the statutory scheme surrounding the statute is another important factor to consider in determining whether Congress intended a private right of action. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 378, 102 S.Ct. 1825, 1839, 72 L.Ed.2d 182 (1982) ("the initial focus must be on the state of the law at the time the legislation was enacted. More precisely, we must examine Congress' perception of the law that it was shaping or reshaping.").

The context of the Federal Deposit Insurance Corporation Improvement Act[3] and of the United States Code provision which includes Section 471 does not create any inference or implication that an RTC transferee is given a private right of action under Section 471. However, the surrounding statutory scheme clearly infers that the RTC has the power to bring suit to enforce Section 471.

Section 471 is an amendment to the Home Owners' Loan Act, 12 U.S.C. § 1441a. Section 471 is to be codified at the end of 12 U.S.C. § 1441a, as subsection (q). Section 1441a establishes the Resolution Trust Corporation, and sets forth its duties, organization and powers. Under Section 1441a, the RTC is given the power to "sue and be sued in courts of competent jurisdiction" and to "exercise any and all powers established under this section and such incidental powers as are necessary to carry out its powers, duties, and functions under this chapter." 12 U.S.C. § 1441a(a)(5)(I) and (J). It is appropriate to assume that Congress was aware of this enforcement power of the RTC when it passed Section 471. *See Cannon v. University of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979).

Section 1441a gives the RTC the authority to bring suit to enforce the provisions of section 471, although by its own terms,

---

**2.** MountainWest Financial argues that an implied federal right of action ought to be found to exist in Section 471 because in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Supreme Court found an implied private action. The statute at issue in *Transamerica* was Section 215 of the Investment Advisors Act of 1940, which provides that contracts whose formation or performance would violate the act "shall be void" as to the violator and knowing successors in interest. *Id.* at 16–17, 100 S.Ct. at 245–46. Visa argues that the statute at issue in *Transamerica* is distinguishable from Section 471 on the basis that different legal consequences flow from contracts which are declared void, and those which are declared valid. The court has carefully considered *Transamerica* and has applied the same analytical process as was employed in that case in determining whether Congress intended to create a private right of action under Section 471. The court finds significant differences between the statutes, the statutory schemes, and the legislative purposes and histories of the two cases, which make a comparison of *Transamerica* with the present case of relatively little assistance, aside from following a similar analytical process in each case.

**3.** Section 471 is within Subtitle M, titled "Other Miscellaneous Provisions" of the Federal Deposit Insurance Corporation Improvement Act of 1991. As the title of the Act suggests, a large portion of the Act amends the Federal Deposit Insurance Act, codified at 12 U.S.C. § 1811 *et seq.* The Act creates the "Bank Enterprise Act," the "Truth in Savings Act" and the "Qualified Thrift Lender Reform Act." The Act also makes numerous amendments to other laws involving financial institutions, including amendments to the International Banking Act, the Home Mortgage Disclosure Act, the Truth in Lending Act, the Fair Debt Collection Practices Acts, the Bank Holding Company Act, the Federal Trade Commission Act, the Electronic Fund Transfer Act, the Equal Credit Opportunity Act, the Right to Financial Privacy Act, the Federal Credit Union Act, the Federal Reserve Act, the Securities Exchange Act, and finally the Home Owners' Loan Act. Because the Act was a compilation of amendments to so many different banking laws, no inference can be drawn from the Act as to whether a private cause of action can be brought under Section 471.

Section 471 is only capable of being violated by a service provider *after* the financial institution has been transferred by the RTC. The RTC's interest in enforcing Section 471 likely would depend upon whatever deterrent effect that such suit would have upon service providers and the RTC's future ability to get the highest possible price for its assets. In any event, there is no dispute by the parties in this case that the RTC has the authority to enforce Section 471.

In summary, the surrounding statutory scheme clearly gives the RTC the authority to enforce the provisions of Section 471, but there is no implication in the statutory scheme of a private right of action by an RTC transferee. Where other remedies are clearly available, courts must be especially reluctant to provide additional private remedies unless there is strong evidence of contrary congressional intent. *Karahalios v. National Fed'n of Fed. Employees*, 489 U.S. 527, 109 S.Ct. 1282, 1286, 103 L.Ed.2d 539 (1989); *Pullman v. Chorney*, 712 F.2d 447, 450 (10th Cir.1983).

### C. *Legislative History*

After having considered the language of Section 471 and its statutory context, statements by members of Congress dealing with the statute must also be considered to ascertain whether a private cause of action was intended by Congress in passing the statute on November 27, 1991.

The entire legislative history of Section 471 is less than 48 hours long. Section 471 was added onto the Federal Deposit Insurance Improvement Act during the House/Senate Conference Committee meeting held on November 25 and into the early morning hours of November 26, 1991. On November 27, 1991, the entire Act, including Section 471, was approved by Congress.

Section 471 was sponsored by Utah Senator Jake Garn, the minority leader of the Senate Banking Committee and a member of the Conference Committee. Other members of the Conference Committee included Senator D'Amato, and Representatives Baker, Gonzalez, LaFalce and Schumer.

The Conference Committee was well aware of this case involving Sears and Visa when it discussed Section 471. In fact, statements by Senators Garn and D'Amato and by Representative Schumer during the Conference Committee meeting indicate that in their view the effect of Section 471 would be to require Visa to issue the credit cards sought by Sears.[4] Statements by legislators predicting the effect of a general law on a specific case obviously are not binding on courts. Furthermore, these statements do not indicate whether the result they predicted would be accomplished

---

**4.** Senator Garn stated:

[I]n the future Section 1133 [Section 471] will prohibit Visa or anyone else in a similar position from acting unilaterally to strip an asset sold by the RTC of its value without first establishing a legal basis to do so.... And although it does involve Sears and both of us have been very open about that, it involves all the transactions within RTC that could cost them a lot of money.

Senator D'Amato stated:

Let's not kid ourselves. There is a lack of competition, real competition in this area [credit cards]. And I am not going to suggest to you that this is going to be end-all and be-all, but this certainly as the Senator has indicated is a step to bring forward that kind of competitive free market force that is necessary in this area.... [I]t [Section 471] really does have a substantial impact on the ability of the RTC to dispose of its assets at the highest and best prices, thereby helping the taxpayer and also promoting good consumer competition. I think the Senator [Garn]

should be commended and I intend to support him.

Representative Schumer stated:

Let's be open about what this is all about, which is that Sears wanted finally, they put out their Discover card it had no fee, but it had 19.8 percent like all the rest of them. So then they decided they want a low interest rate credit card to try and break the market. You needn't break the lack of competition in the market. You need a big guy to do that. There are lots of little banks that can issue low interest rate credit cards, they don't do much good.... But now what is happening, Mr. Chairman, is that Visa is excluding the little bank from its network on a technicality at the behest of all the other large banks so that they can't issue their low interest rate credit cards. And what I believe the legislation attempts to do is undo that situation with that idea.

Transcript of House/Senate Conference Committee Meeting, Nov. 25–26, 1991, at 348–51.

through an action by the RTC, through a breach of contract action by the transferee, or through a private action based on the statute itself.

Statements by the other three members of the Conference Committee, namely Representatives Baker, LaFalce and Gonzalez, indicate that they were concerned over the amendment because of the impact that it might have on this litigation. Committee members D'Amato and Schumer tried to allay these concerns by stating that this litigation is posited on an antitrust basis, so it would proceed without any prejudice. Senator Garn reiterated that the purpose of Section 471 was to not devalue the assets of the RTC.[5] The Conference Committee's report on Section 471 is silent on the Sears/

Visa dispute and on who may bring suit to enforce its provisions.[6]

Because the full Congress was not privy to the Conference Committee's discussion, statements made during the floor debates in the House of Representative and in the Senate on November 26 and 27, 1991, respectively, are important indicators of what Congress as a whole intended when it voted in favor of Section 471 and the Act as a whole.

Statements by congressmen on the floor of the House of Representatives on November 26, 1991, were to the effect that this lawsuit between Sears and Visa would be unaffected by Section 471, and that the purpose of Section 471 was to benefit the RTC in its efforts to dispose of its assets.[7]

---

**5.** Senator Garn stated as follows to the Conference Committee:

> The RTC strongly supports Senate Section 1133 [Section 471]. It fills a critical gap in the statutory scheme put in place by Congress in FIRREA in 1989.... [discusses history of FIRREA and RTC].... Congress gave the RTC broad ranging powers, including the power to transfer any asset of a failed institution without any approval or consent with respect to such transfer. That is FIRREA language. In order to be able to sell such assets at the best possible price, the RTC must not only be able to transfer them without obtaining third party consent as FIRREA already provides, but it must also be able to provide assurance to purchasers that the assets will have the value in the purchasers' hands. If the asset is a contract for services, it will obviously have little or no value if the service provider is free to arbitrarily terminate the contract following its transfer.
>
> . . . . .
>
> I don't know how to be more explicit than I have that it [Section 471] affects RTC failed assets, and I don't want to devalue other people who may want to borrow on these failed S & Ls, if they think they can't transfer those assets, they are not going to buy it, and at least RTC stuck with it.
>
> . . . . .
>
> That is the intent of my amendment not to devalue the assets.

Transcript of House/Senate Conference Committee Meeting, Nov. 25–26, 1991, at 346, 353, 356.

**6.** The Conference report states the following in reference to Section 471:

> Title XI [Section 471] clarifies the effect of transfers of certain assets of failed savings associations by the Resolution Trust Corporation acting as conservator or receiver. It requires any person who was obligated to pro-

vide services to a savings association at the time that the association entered into conservatorship or receivership to continue to provide those services to any person to whom the right to receive those services was transferred by the RTC after the date of enactment of FIRREA. These rights might include, among others, rights arising under contracts, membership rights in associations, service corporations and the like. Under this provision, such rights may only be terminated as a result of the failure by the transferee to comply with a material term or condition of the original obligation.

S.Rep. No. 167, 102d Cong., 1st Sess., at 207–08 (1991).

**7.** Representative Brooks stated:

> I have a question really. Section 1133 [Section 471] of S.543 which was accepted by the conferees on the banking bill is a pending antitrust issue that should rightfully be determined in the courts. Since the matter involves litigation between Sears and Visa, Congress should let the matter be determined by the tenth circuit. *I would like to clarify for the record that nothing in the language of section 1133 [Section 471] is intended to interfere with the pending Sears–Visa litigation.*

Representative Gonzalez, responded to Representative Brooks's comment as follows:

> I questioned that last night. Unfortunately, I wish I had had the aid of my chairmen, but I did not. To be specific, the date they have in that amendment, August 9, 1989, is the date of the enactment of FIRREA. FIRREA, which we are enacting now, *it certainly was never the intention to retroactively abridge or restrict the legal rights of anybody.*

Utah Congressman Bill Orton also expressed his view that Section 471 should not be construed to affect the lawsuit between Sears and Visa:

The House debate contains no discussion or inference about whether a private right of action exists under Section 471.

The debate before the full Senate is equally silent on the issue of whether a private action can be brought under Section 471. Senator Garn stated on the floor of the Senate on the date the statute was passed, November 27, 1991:

> This provision is intended to help the RTC dispose of its assets. In order to be able to sell such assets at the best possible price, the RTC must not only be able to transfer them without obtaining any third-party consents, as FIRREA already provides, but it must also be able to provide assurance to purchasers that the assets will have value in the purchasers' hands. It is this concern that section 1133 [Section 471] addresses.

137 *Cong.Rec.* S18626 (daily ed. Nov. 27, 1991).

Senator Metzenbaum asked Senator Garn during the floor debate if his understanding was correct that Section 471 "does not prejudice antitrust claims that are in dispute in any litigation currently pending in Federal court." *Id.* Senator Garn responded by saying: "Yes, Mr. President, the Senator is correct that I stated to him last week that this legislation addresses only the ability of a services provider to refuse to honor servicing rights purchased from the Resolution Trust Corporation. It would not affect any legal claims or any Federal antitrust litigation." *Id.*

In summary, no member of Congress specifically stated before the statute was passed [8] that an RTC transferee could bring a private cause of action under Section 471. The legislative history is silent, or at best ambiguous, as to whether a private remedy exists. This is often the case where the statute does not expressly create or deny a remedy. *Cannon v. University of Chicago*, 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979). However, the legislative history clearly indicates that the purpose and intent of Section 471 was to benefit the RTC. Furthermore, statements by members of Congress indicate that Section 471 was not intended to have any effect on the antitrust issues pending in this lawsuit. The legislative history contains no indication that Congress was aware that MountainWest Financial's antitrust lawsuit could be changed into a lawsuit involving this very statute simply by MountainWest Financial amend-

---

In the course of the conference committee's deliberations, it adopted section 1133 [Section 471] of the Senate bill dealing with the transfer of assets by the RTC. *While I agree with the thrust of the section, that the RTC should not be unduly impeded in its attempts to dispose or otherwise transfer the assets of failed depository institutions, this provision threatens to interfere with a current legal dispute.* Specifically, it threatens an ongoing litigation between Sears and VISA in the U.S. District Court in Utah posing significant issues in antitrust and commercial law. Mr. Chairman, *I do not believe this provision should be construed to interfere with that dispute.* In particular, I think that adoption of this provision should not impede the court in dealing with the complex antitrust issues presented by the case.
137 *Cong.Rec.* H11841, H11854 (daily ed. Nov. 26, 1991) (emphasis added).
Representative Baker stated as follows on the floor of the House of Representatives:
*I would like to make clear that the purpose of this provision [Section 471] is simply to facilitate the disposition of RTC property and not to interfere with any ongoing litigation.* There is now pending a very important lawsuit before the U.S. District Court in Utah, ... regarding the antitrust issues of the right to membership in the Visa program and the issuance of Visa cards by an institution transferred by the RTC, and the impact of a Visa bylaw that prohibits competitors from participating in the Visa program. It is my view, and I believe that other members of the Committee also hold this view, that these issues should appropriately be decided by the courts, and that the litigation will go forward and will not be impeded by section 1133 of the banking bill.
137 *Cong.Rec.* at E4241–42 (daily ed. Dec. 18, 1991) (statement of Rep. Baker, Nov. 26, 1991) (emphasis added).

**8.** On December 18, 1991, three weeks after the Act's passage, Senator Garn stated on the Senate floor that Section 471 "establishes the right of anyone to whom the RTC sells such an asset ... to bring suit to enforce the rights that it has purchased." 137 *Cong.Rec.* S18820 (daily ed. Dec. 18, 1991). This statement does not necessarily mean that such a suit would be a private action under Section 471 as opposed to an action for breach of contract, which clearly can be brought by an RTC transferee.

ing its Complaint as it has. Some members of Congress were of the view that this statute would enable MountainWest Financial to launch its Prime Option program through Visa, but such views do not indicate, explicitly or implicitly, whether this would come about by an action by the RTC, through a breach of contract action, or through a private action based on the statute itself.

Based on the foregoing review of the language of Section 471, the surrounding statutory scheme, and the legislative history, the court finds that there is insufficient evidence that Congress intended RTC transferees to have a private cause of action in federal court. The clear intent of Congress in passing Section 471 was to help the RTC (and taxpayers at large) receive the highest possible price when selling failed federally insured banks; it was not a special relief bill to help RTC transferees. Without a clearer indication of Congressional intent to provide a private cause of action, this court is unwilling to expand its jurisdiction and say that such a cause of action exists. Accordingly, MountainWest Financial's motion pursuant to Count VI of its Amended Complaint is denied, and Visa's Motion to Dismiss is granted as to Count VI.

## II. BREACH OF CONTRACT CLAIM AND SECTION 471

An RTC transferee is not left without a remedy if it has been damaged by a violation of Section 471. Section 471 clearly establishes the existence of the obligation of a service provider towards an RTC transferee, which can provide the basis for a common law breach of contract claim—such as Count VII of MountainWest Financial's Amended Complaint.[9] The court will now consider the merits of Section 471 in relation to Count VII in order to resolve Visa's Motion to Dismiss that Count. The central issue in this regard is whether Visa's refusal to provide services to MountainWest Financial is based on MountainWest Financial's "failure to comply with [a] material term or condition of the original obligation" that MountainWest Savings and Loan had with Visa. The legislative history of Section 471 will not be considered in this analysis because the language of the statute is unambiguous. *United States v. Goode,* 945 F.2d 1168, 1169 (10th Cir.1991).

MountainWest Financial argues that Section 471 requires Visa to continue to provide the same services that Visa provided to MountainWest Savings prior to it being taken over by the RTC. Thus, since MountainWest Savings had the right to launch a Prime Option program, MountainWest Financial argues that it should have that right as well. MountainWest Financial claims that it has complied with all material provisions of MountainWest Savings' original obligation with Visa; including all of Visa's bylaws and operating regulations for which MountainWest Savings was accountable.

Visa, on the other hand, asserts that MountainWest Financial has failed to comply with certain material terms and conditions of the original obligation. Mountain-West Savings was subject to all of Visa's

---

**9.** MountainWest Financial's Breach of Contract claim, like its claim under Section 471, seeks injunctive relief by alleging that "unless Visa is restrained ... MountainWest Financial will suffer irreparable injury for which there is no adequate remedy at law." Even if the court had found that a private cause of action exists under Section 471, MountainWest Financial would need to have established that an injunction is the appropriate form of relief for Visa's alleged violation of Section 471, which it has failed to do. MountainWest Financial limited its motion to Count VI on the basis that injunctive relief would somehow be easier to establish as a result of a violation of a federal statute as opposed to a breach of contract. However, establishing the existence of an irreparable injury for which money damages are inadequate is required for an injunction under both claims. *Cf. Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975) (establishing traditional prerequisites of irreparable harm and inadequacy of legal remedies required before injunction remedy could issue pursuant to implied right of action under federal securities laws). Furthermore, the scope of an implied remedy to a federal statute also requires a determination of congressional intent, which has not been established here. *See Virginia Bankshares, Inc. v. Sandberg,* — U.S. —, 111 S.Ct. 2749, 2763–64, 115 L.Ed.2d 929 (1991).

bylaws and any future amendments to those bylaws. Visa argues that Mountain-West Financial has failed to comply with Visa Bylaws 2.06 and 2.10(e).[10] Mountain-West Financial asserts that these bylaws were not part of the original obligation. The court will first address whether Bylaw 2.06 was a part of MountainWest Savings' original obligation.

### A. Bylaw 2.06

■ Visa Bylaw 2.06 states in pertinent part:

> If permitted by applicable law, the corporation shall not accept for membership any applicant which is issuing, directly or indirectly, Discover cards or American Express cards, or any other cards deemed competitive by the Board of Directors; an applicant shall be deemed to be issuing such cards if its parent, subsidiary or affiliate issues such cards.

MountainWest Financial claims that because this bylaw refers to "applicant[s]" and "accept[ance] for membership," it does not impose obligations on existing Visa members. Since MountainWest Savings was an existing Visa member and not an "applicant," it is argued that Bylaw 2.06 was not part of the original obligation.

Visa asserts that MountainWest Savings' was obligated to comply with Bylaw 2.06. Although the bylaw refers to "applicants," other Visa regulations and practices make this bylaw binding upon existing members as well. Visa requires that a new Membership Agreement be executed upon the rechartering or transfer or name change of any member institution. Under this Membership Agreement, the institution is considered an applicant and is required to comply with all existing bylaws. If any Visa member is acquired by another entity, the transfer or rechartering would necessitate the execution of a new Membership Agreement. The existing member thereby becomes an "applicant," subject to the terms of Bylaw 2.06. Accordingly, Visa argues that Bylaw 2.06 was a part of Mountain-West Savings' original obligation.

MountainWest Financial was required by Visa to execute a new Membership Agreement. When Visa became aware that MountainWest Savings had been placed in the conservatorship of the RTC, it sent a letter to MountainWest Savings, which stated in part:

> Visa Operating Regulations require that a Member's current legal name be recorded on its Membership Agreement with Visa U.S.A. Inc. In the event that a Member's legal name is changed as a result of a change in charter, a new Membership Agreement must be executed by the Member with its current legal name.

(Exhibit 1 to Declaration of Roy Worley, Visa Exhibit 20). Visa sent similar letters to other institutions that had been taken over by the RTC. (Declaration of Roy Worley ¶ 3, Visa Exhibit 20).

In September, 1990, MountainWest Financial sent a letter to Visa with an updated Membership Agreement indicating that MountainWest Savings had been rechartered and renamed MountainWest Financial.[11] (Sears Exhibit 16). MountainWest Financial understood that an updated Membership Agreement was required by Visa because the RTC transfer involved a change in the charter. MountainWest Financial tried to avoid being considered an

---

**10.** Visa also asserts that MountainWest Financial violated other Visa bylaws and operating regulations including Visa Bylaw 2.08. Visa Bylaw 2.08 prohibits the transfer of a Visa membership except as provided in the bylaws. MountainWest argues that FIRREA renders Bylaw 2.08 inoperable. FIRREA allows the RTC to "transfer any asset or liability of the institution in default ... without any approval, assignment, or consent with respect to such transfer." 12 U.S.C. § 1821(d)(2)(G)(i)(II). While it is not exactly clear whose approval Congress was referring to, Congress could have meant that an asset could be transferred without the approval of a service provider. There is a legitimate question whether FIRREA overrides Bylaw 2.08, but the court does not decide that issue and bases its decision on Bylaws 2.06 and 2.10(e).

**11.** MountainWest Financial is not merely the same entity as MountainWest Savings with a different name. MountainWest Financial is comprised of the assets of MountainWest Savings & Loan, including the Visa membership, and the assets of Basin Loans, a Utah Industrial Loan Company.

applicant by typing at the top of the Membership Agreement form: "Updating existing membership information. Not a new application." Nonetheless, under Visa practices, MountainWest Financial, as a rechartered institution and new legal entity, was an applicant subject to all Visa bylaws. By signing the Agreement, MountainWest Financial agreed "to be bound by and perform all requirements of membership as stated in the present Bylaws and Operating Regulations of Visa U.S.A. and any future amendments." MountainWest Financial further certified by signing the Agreement that it met "all requirements for membership." (Sears Exhibit 16).

Visa's procedure was to scrutinize the Membership Agreement form to ensure that the entity submitting the Agreement satisfied all of Visa's membership requirements. Visa did not discover that MountainWest Financial was not in compliance with Bylaw 2.06 because the Agreement form did not reveal that MountainWest Financial was owned by Sears. MountainWest Financial avoided including anything on the Agreement which would reveal its affiliation with Sears. As discussed earlier, Sears was well aware of Visa's prohibition against its participation in the Visa system before it acquired MountainWest Savings. Visa only discovered that Sears was involved with MountainWest Financial when it saw an RTC printout in January, 1991, which was approximately the same time that MountainWest Financial had placed its initial request for 1.5 million Visa cards. (Declaration of Roy Worley ¶ 13, Visa Exhibit 20). At that point, Visa refused to issue the cards and to recognize the membership of MountainWest Financial.

The court finds that Bylaw 2.06 was part of MountainWest Savings' original obligation. Even though the bylaw refers to "applicant[s]," under Visa's practices, each existing member became an applicant in the event of transfer, recharter or name change. Furthermore, the Membership Agreement form that was submitted by MountainWest Financial to Visa was, in practice and effect, an "application" for membership because Visa had the discre-

tion to either accept or reject the proposed Agreement based on the information provided.

MountainWest Savings could not have been acquired by Sears through a transfer or recharter. If it had been, it would have had to submit a new Membership Agreement, and the new application would have been rejected pursuant to Bylaw 2.06. The intent of Bylaw 2.06 is to prohibit Sears from participation in Visa. This prohibition applies to all new applicants as well as existing members who become affiliated with Sears through a transfer or recharter. Accordingly, part of MountainWest Savings' original obligation was a restriction against affiliation with Sears.

MountainWest Financial, by virtue of its affiliation with Sears, failed to comply with a material term and condition of the original obligation. Accordingly, Visa's refusal to provide services to MountainWest Financial is within the exception to Section 471.

### B.  Subsequent Amendments and Resolutions by Visa

██ Not only was MountainWest Financial subject to Visa Bylaw 2.06 as a result of the original obligation, but Visa also argues that MountainWest Financial is further bound by resolutions adopted by the Visa Board of Directors after discovering that MountainWest Financial was owned by Sears. In March, 1991, Visa's Board of Directors adopted the following resolutions:

> RESOLVED, that pursuant to Section 2.10(b) of the By–Laws, the corporation hereby expels SCFC ILC, Inc., assuming it is a Member of Visa, U.S.A., as a result of its affiliation with Sears Roebuck & Company, which directly or indirectly issues the Discover cards; this action is taken to enhance and promote inter-system competition between Visa and Discover.

The Board then amended Bylaw 2.10 as follows:

> RESOLVED, that Section 2.10 of the By–Laws of the corporation be and hereby is

amended by adding a subsection (e) to read as follows:

The membership of any Member shall automatically terminate in the event it, or its parent, subsidiary or affiliate, issues, directly or indirectly, Discover Cards or American Express Cards, or any other card deemed competitive by the Board of Directors; in the event the Member has issued such competitive card prior to the Board declaring such card competitive, the membership of such Member shall not terminate if it discontinues issuing such competitive card within 60 days of notification by Visa. Outstanding competitive cards need not be cancelled prior to expiration.

Visa argues that MountainWest Financial is subject to the new resolutions for two reasons. First, Visa asserts that because the original agreement required the member to abide by future bylaw amendments, the new resolutions are deemed part of MountainWest Savings' original obligation, and therefore binding on MountainWest Financial. Second, when MountainWest Financial signed the new Membership Agreement it agreed to abide by future amendments. Thus, Visa argues that under either theory MountainWest Financial is bound to comply with Bylaw 2.10(e) and the Resolution terminating its membership.

The court need not rule on whether the new enactments are binding upon MountainWest Financial because it has already found that Bylaw 2.06 was a material part of the original obligation. However, the court finds that the agreement to be bound by future amendments was indeed a part of MountainWest Savings' original obligation and is effective between Visa and MountainWest Financial pursuant to the RTC transfer and Section 471.

MountainWest Financial argues that because it is an RTC transferee, allowing Visa to reject its membership would violate the purpose and intent of FIRREA and Section 471. Such a ruling, it is argued, would allow a service provider to arbitrarily terminate a transferee, and would render the statutes meaningless.

The court finds, however, that its ruling is harmonious with FIRREA and Section 471. Those statutes were intended to increase the value of a failed thrift's assets by restricting the service provider's ability to arbitrarily terminate RTC transferees. This was accomplished by giving the transferee the *same* rights and obligations of the failed institution. Therefore, the transferee is entitled to everything that the failed thrift had before it failed. The transferee is not entitled to more than that. Section 471 does not give the transferee a super-membership with rights greater than those of the failed thrift. Section 471 was not intended to change the terms and conditions of the original obligation. It was, in fact, clearly intended to preserve the original contract. The new resolutions do not appear to be an attempt by Visa to refuse to deal with an RTC transferee as such, nor is there evidence that this was done in bad faith in an attempt to circumvent FIRREA or Section 471. Instead, the amendments are in furtherance of Visa's previously stated intention not to allow for membership those who issue competitive cards. This is consistent with Visa's past actions and in accordance with its contractual rights. Visa simply expanded its bylaws to solidify its previous restriction against Sears affiliates.

Visa is able to exclude MountainWest Financial because the restrictions against membership by a Sears affiliate was a material condition of the original agreement between Visa and MountainWest Savings. Since MountainWest Savings was prohibited from affiliating with Sears, MountainWest Financial is also prohibited. This restriction is not altered simply because the RTC was involved. Visa's termination of MountainWest Financial was based on preexisting membership qualification requirements, and it was not an arbitrary refusal to deal with an RTC transferee. There has been no showing of bad faith, or improper treatment of RTC transferees on the part of Visa. Accordingly, the court holds that MountainWest Financial failed to comply with material terms and conditions of the original obligation.

This ruling is also not inconsistent with what members of Congress stated with respect to Section 471. For instance, Senator Garn remarked on the Senate floor on December 18, 1991, that Section 471 will "allow Sears to exercise Visa membership rights that it purchased from the RTC. Under this provision, Sears is entitled to enforced [sic] those rights, *unless the exception that I mentioned earlier applies.*" S.Rep. No. 167, 102nd Cong., 1st Sess. at S18820 (daily ed. Dec. 18, 1991) (emphasis added). The court has found that the exception does indeed apply. Senator Garn also stated that Section 471 was designed to prohibit a service provider from arbitrarily terminating service contracts with an RTC transferee. *See supra* note 5. As stated above, Visa's refusal to provide services to MountainWest Financial was not arbitrary, but was based on conditions of the original contract.

■ There remains, however, one issue of material fact which precludes dismissal of MountainWest Financial's contract claim (Count VII). A question of fact exists as to the legality and thus the enforceability of Visa's contract terms that prohibit participation by Sears.

MountainWest Financial began this lawsuit by claiming that Visa's bylaws which prohibit association with Sears are illegal under federal and state antitrust laws. An illegal contract term is unenforceable and will be stricken from the contract while the remainder of the agreement may be enforced. *See* Restatement (Second) of Contracts §§ 178, 184 (1981). Thus, if the terms of the contract that prohibit Sears from participating in the Visa network are found to be illegal, they will be stricken from the contract. Visa would then no longer be able to argue that MountainWest Financial failed to comply with a "material term or condition of the original obligation" and Visa may be required to provide the requested services pursuant to Section 471.

Thus, the legality and enforceability of the relevant contract terms under the antitrust laws is a material issue of fact that must be decided at trial. Accordingly,

Visa's Motion to Dismiss Count VII is denied at this time.

Based on the foregoing,

IT IS HEREBY ORDERED that plaintiff MountainWest Financial's Motion to Enforce it Rights Under Federal Banking Law is DENIED; and

IT IS FURTHER ORDERED that defendant Visa's Motion to Dismiss is GRANTED as to Count VI of the Amended Complaint, but is DENIED as to Count VII of the Amended Complaint.

IT IS SO ORDERED.